**SEALED**

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   17-8510-JMH |
| JOHN MICHAEL SKEFFINGTON, | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

**FILED by _____ D.C.**

**DEC – 6 2017**

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____5/2016-12/3/2017_____ in the county of _____Palm Beach_____ in the _____Southern_____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit health care fraud |
| 18 U.S.C. § 1512(c)(2) | Attempted obstruction of justice |
| 18 U.S.C. § 1518(a) | Attempted obstruction of a criminal investigation of a health care offense |

This criminal complaint is based on these facts:

Please see attached Affidavit of Special Agent William Stewart.

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent William Stewart, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  12/6/17

*Judge's signature*

City and state:  _____West Palm Beach, FL_____    U.S. Magistrate Judge James M. Hopkins
*Printed name and title*

**AFFIDAVIT**

I, Special Agent William Stewart, being duly sworn, do hereby depose and state:

**Affiant's Background**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), currently assigned to the Miami Division, Palm Beach County Resident Agency. I have been employed with the FBI since August 2010. Prior to becoming a Special Agent, I worked in the banking industry for approximately five years, employed as a fraud and anti-money laundering investigator and as a Bank Officer managing the corporation's Bank Secrecy Act program. I am presently assigned to investigate a wide variety of health care fraud matters, including schemes to defraud private insurance companies. I have received training from the FBI on matters related to health care fraud investigations and have attended multiple conferences and seminars on conducting health care fraud investigations.

2.      I am personally involved in conducting a joint investigation with other Federal, State, and Local law enforcement agencies into alleged criminal activities perpetrated by JOHN MICHAEL SKEFFINGTON ("SKEFFINGTON") and his criminal associates through Peaceful Encounters, LLC ("PEACEFUL"), National Diagnostic Testing Inc. ("NDT"), Zenith Health Services, Inc. ("ZENITH"), Monty Health Care Services, Inc. ("MONTY"), (collectively referred to as the "ENTITIES"). The ENTITIES purport to be laboratory marketing companies that provide urine specimens of addiction treatment patients to laboratories for purported confirmatory testing. The statements contained in this Affidavit are based upon a review of public and private records, interviews, and other investigative activities conducted by law enforcement personnel assigned to this case.

3.     This Affidavit is being submitted in support of a Criminal Complaint charging JOHN MICHAEL SKEFFINGTON ("SKEFFINGTON") with conspiracy to commit health care fraud, attempted obstruction of justice, and attempted obstruction of a criminal investigation of a health care offense; in violation of 18 U.S.C. §§ 1349, 1512(c)(2), and 1518(a). Because this Affidavit is provided for the limited purpose of establishing probable cause for a Criminal Complaint, I have not included all aspects of this investigation in this Affidavit, but rather have set forth only those facts necessary to establish probable cause to believe that the defendant has committed the charged offenses.

4.     Defendant SKEFFINGTON paid individuals a predetermined percentage of insurance reimbursements for excessive and medically unnecessary testing of the urine specimens of addiction treatment patients. SKEFFINGTON contracted with "marketers" who had connections to sober homes and treatment centers. When the "marketers" referred sober homes and treatment centers to SKEFFINGTON that could and did provide addiction treatment patients' urine samples, SKEFFINGTON would route the urine to laboratories for expensive and fraudulent urine testing. In exchange for the ability to submit insurance claims for the urine testing, the laboratories would pay SKEFFINGTON a percentage of the insurance reimbursements, which SKEFFINGTON, through PEACEFUL and NDT, passed on to his "marketers."

5.     When SKEFFINGTON learned of Federal law enforcement's actions in prosecuting those engaged in addiction treatment fraud, SKEFFINGTON attempted to cover up the fact that he was kicking back to his "marketers" a percentage of paid reimbursements on insured addiction treatment patients. To do so, SKEFFINGTON provided backdated contracts, invoices, and federal tax documents to his "marketers."

6.     The backdated contracts, invoices, and federal tax documents were concocted to make it appear that the payments to "marketers" were made on an hourly rate schedule rather than a percentage of insured patient reimbursements.

## Background on Drug and Alcohol Rehabilitation

7.     In recent years, South Florida, particularly Palm Beach and Broward Counties, have become destinations for drug and alcohol addicts seeking assistance in becoming and remaining sober. News reports estimate treatment for substance abuse is Palm Beach County's fourth largest industry, with revenues in excess of $1 billion per year. Substance abuse treatment is regulated under state and federal law, which describe a continuum of care including, from most intensive to least intensive, inpatient detox, PHP, IOP, and OP. Persons undergoing treatment on an out-patient basis, whether in PHP, IOP, or OP, will elect to live in a "recovery residence," also know n as a "sober home" or "halfway house," with other persons who are also in treatment and committed to a drug and alcohol-free lifestyle.

8.     Detox is meant for individuals who are still addicted to and using controlled substances and/or alcohol. Detox facilities are inpatient facilities where patients are assisted in dealing with the effects of withdrawal from the complete cessation of using drugs and/or alcohol. After successfully completing detox, patients receive treatment for their underlying addiction in the form of outpatient care, either through PHPs, IOPs, and OPs. PHP, IOP, and OP patients attend facilities on an ongoing basis where treatment is rendered, generally in the form of therapy sessions. The distinction between the three relates to the amount of therapy time on a daily or weekly basis, and patients generally transition from detox to PHP, then to IOP, and finally to OP as they overcome their addiction.

9.      Sober homes, conversely, do not provide medical care or clinical services to their residents, but operate solely as group residences where residents can live with a support network of others in recovery.  Since sober homes are merely places to live, they generate income to cover expenses through the collection weekly or monthly rent paid by their residents, just as with any other landlord-tenant relationship.

10.     Medical and osteopathic doctors play an essential role in substance abuse treatment. Without a doctor, patients at the substance abuse treatment centers would not receive prescriptions for drugs, receive treatment, or have urine, blood, or other bodily fluid testing.  Bodily fluid tests, which are prescribed by the doctors, are billed to health plans by the substance abuse treatment centers, as are patient evaluations performed by a physician.

11.     Substance abuse treatment facilities conduct UA testing in order to determine whether a patient has been using any drugs or alcohol. A point of care (POC) cup which tests for 12 different types of drugs. The POC cup can cost less than $5 and provides an immediate result as to whether a sample is positive or negative. In addition to POC testing, liquid chromatography-mass spectrometry (LCMS) is an enhanced type of UA conducted in a laboratory setting. Single urine specimens that undergo LCMS testing can be billed to insurance companies in excess of $9,000.

### Payment for Substance Abuse Treatment

12.     The Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. 111-148, and other federal laws expanded the availability of private insurance to pay for substance abuse treatment in several ways.  First, the ACA allowed parents to maintain health insurance for their children through their own insurance policies until the children reached the age of 26. Second, federal law mandated that substance abuse treatment and other mental health treatment

must be covered and reimbursed by insurance policies in the manner and at the same levels as other medical treatment. Third, the ACA required insurance companies to cover individuals regardless of prior existing conditions. Fourth, annual and lifetime caps on coverage were removed. Fifth, the ACA created insurance exchanges that allowed uninsured individuals to apply for and obtain coverage from private insurers. The combination of these provisions created insurance coverage for patients and substance abuse treatment that had previously been excluded from coverage.

13.    These federal laws created access to coverage through a number of avenues, including health plans sponsored by private employers, federal health care benefits programs, and health plans offered directly by private insurance companies. Private insurance companies administer health plans sponsored by private employers and governmental employers. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

14.    The National Railroad Passenger Corporation, doing business as Amtrak ("Amtrak") was a private, for profit, Government corporation, that operated a nationwide system of passenger rail transportation. As part of its employee benefits package, Amtrak established employee health and welfare benefit plans to provide healthcare to their employees, including their spouses, domestic partners and dependent children (collectively, "dependents").

15.    The Federal Employees Health Benefits Program ("FEHBP") provides federal health care benefits to federal employees and their dependents. The United States Office of Personnel Management ("OPM") managed the FEHBP and contracted with various insurance companies to offer these benefits. FEHBP reimbursed the various insurance companies it

contracted with for the money the insurance companies paid out for medical benefits, items and services for federal employees. BlueCross/BlueShield (BCBS) was one of the various insurance companies contracted by the Office of Personnel Management to offer medical benefits, items and services to federal employees under the FEHBP.

16.     Both ERISA and non-ERISA health benefit plans were offered or administered by private insurance companies, including Blue Cross/Blue Shield, Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

17.     All of these health benefit plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is, public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

18.     Under state and federal law, all of these health benefit plans were only responsible for claims for services that: (a) were "medically necessary," (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plan, including the obligation to pay co-insurance and deductibles.

19.     To bill insurance companies for substance abuse treatment and bodily fluid testing, substance abuse treatment facilities and labs submit paper and electronic claims using a number of standardized forms, including the "CMS-1450," the "CMS-1500," and the "HCFA-1500". ("CMS" refers to the Centers for Medicare and Medicaid Services, and "HCFA" refers to the Health Care Financing Administration, the predecessor to CMS.) Regardless of the form used, by submitting a claim, the provider is certifying that the treatment or lab service was medically necessary and actually rendered, and the provider is warned that providing false, incomplete, or misleading information can result in civil and criminal penalties. Before billing for lab tests, providers must first obtain a prescription from the patient's medical doctor, who must deem the

test medically necessary. HCFAs contain, among other information, the client's name and biographical information, his or her insurance information, diagnosis, date and place of service, the standardized procedure codes, the number of units provided, the total dollar amount being charged and name and location of the billing company. The procedure code and the unit volume assist in determining the dollar amount at which the client's insurance company will reimburse the provider. Completed HCFAs can be printed and mailed to insurance companies or they can be submitted electronically. When the HCFA is submitted, the provider certifies that the contents of the HCFA are true, correct and complete.

### The Charged Offenses

20.      It is a federal offense to conspire with others to knowingly and willfully execute, or attempt to execute, a scheme or artifice: (1) to defraud any health care benefit program or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C. §§ 1347, 1349. As noted above, the health benefit plans described above were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b).

21.      Title 18, United States Code, Section 1512(c)(2) prohibits corruptly obstructing, influencing, or impeding any official proceeding, or attempting to do so.

22.      Federal law also makes it a crime to willfully prevent, obstruct, mislead, delay or attempt to prevent, obstruct, mislead, or delay the communication of information or records relating to a violation of a Federal health care offense to a criminal investigator. 18 U.S.C. § 1518(a).

7

**The Health Care Fraud Investigation**

23.     In late 2016 and early 2017, the FBI and other members of the Greater Palm Beach Health Care Fraud Task Force conducted an investigation of Reflections Treatment Center ("RTC"), Journey to Recovery ("JTR"), their owner, Kenneth Chatman, and his criminal associates.  Chatman and ten others have been convicted on health care fraud conspiracy, false statements, obstruction of justice, and other charges.  During the course of that investigation, statements were taken from many defendants who described a scheme of referring unnecessary bodily fluid testing to certain labs in exchange for tens of thousands of dollars in kickbacks. SKEFFINGTON and some of his affiliated labs were identified as the source of some of the kickback payments.

24.     During the RTC/JTR/Chatman investigation, a cooperating witness (CW) was identified as someone who had contact with SKEFFINGTON and others related to the unnecessary lab testing/kickback scheme.  CW was interviewed and admitted that SKEFFINGTON had paid kickbacks to the CW in exchange for referrals of sober homes and addiction treatment centers that provided urine samples from insured patients, which SKEFFINGTON then provided to labs for confirmatory testing.  The CW received these kickback payments from SKEFFINGTON and his associates from at least as early as September 2015, in the form of checks drawn on bank accounts related to SKEFFINGTON and other members of the conspiracy.  In addition to the CW, whose information was corroborated by recordings detailed below, the CW's information has been corroborated by recorded interviews of other witnesses, bank records, and other documentary evidence.

25.     SKEFFINGTON paid individuals a predetermined percentage of insurance reimbursements based on the number of samples of urine from addiction treatment patients with

8

insurance. SKEFFINGTON would contract with individuals who had connections to sober homes and treatment centers, where insured addiction treatment patients would provide urine for testing. SKEFFINGTON referred to these individuals as "marketers." When the "marketers" referred the sober homes and treatment centers to SKEFFINGTON that could and did provide urine samples of addiction treatment patients with insurance, SKEFFINGTON would route the urine samples to laboratories for expensive and fraudulent urine testing, that is, testing that was not medically necessary, properly prescribed, used to direct the patients' treatment, or billed in accordance with the terms and conditions of the patients' insurance policies. In exchange for the urine and the ability to file insurance claims, the laboratories would pay SKEFFINGTON a kickback, that is, a percentage of the insurance reimbursements, which SKEFFINGTON, personally and through corporate entities he controlled, passed on to his "marketers."

26.    A bank account in the name of Peaceful Encounters, which lists M.M. as the sole member, received multiple deposits from a laboratory involved in the fraudulent urine testing totaling approximately $123,000. Peaceful Encounters transferred a significant amount to a known associate of SKEFFINGTON, and that associate then paid over $11,000 to the CW.

27.    A bank account in the name of Zenith Health Services, Inc., which is controlled by SKEFFINGTON and B.H., received multiple deposits ranging from $10,000 to $94,000 between June 1, 2017 and June 30, 2017. Zenith then paid multiple co-conspirators via check pursuant to SKEFFINGTON's agreements with the co-conspirators to send the bodily fluids of insured patients for expensive confirmatory lab testing. SKEFFINGTON and B.H. have signature authority over the Zenith bank account. SKEFFINGTON and B.H. are related through marriage.

28.    To hide the true source of the kickbacks, SKEFFINGTON and his associates also used bank accounts in the names of Skeffington's Furniture and Mattress ("SFM"), PEACEFUL,

9

ZENITH, NDT, MONTY, and the personal bank account of his associate, M.M.  These accounts received cash deposits, wire transfers, and ACH deposits from clinical laboratories, and then checks were written to individuals who were identified as "marketers," that is, individuals associated with sober homes and treatment centers that had insured patients.

29.     For example, bank records from PEACEFUL show ACH deposits from a laboratory that SKEFFINGTON routinely sent urine to for testing as part of the conspiracy.  Between January and May of 2016, the lab deposited over $100,000 to PEACEFUL's bank account.  PEACEFUL then distributed the money from the lab to the individuals who brought insured patient urine specimens to SKEFFINGTON.

30.     The RTC/JTR/Chatman case appeared in numerous newspapers and, from conversations between the CW and SKEFFINGTON, caused SKEFFINGTON to be concerned that he would be charged.  In an attempt to cover up the fact that he was paying kickbacks to his "marketers," that is, a percentage of paid reimbursements on insured addiction treatment patients, SKEFFINGTON and his associates decided to provide backdated contracts, invoices, and federal tax documents to his "marketers."

31.     The backdated contracts, invoices, and federal tax documents were concocted to make it appear that the payments to "marketers" were salaries paid on an hourly rate schedule rather than a percentage of insured patient reimbursements.   The corporations that SKEFFINGTON used in an attempt to cover up the percentage of paid reimbursements to the CW included PEACEFUL and NDT.  PEACEFUL, NDT, and SKEFFINGTON paid kickbacks to individuals who referred sober homes and treatment centers that provided insured patient urine for testing.  SKEFFINGTON was the true owner and operator of PEACEFUL, but corporate records filed with the Florida Department of State reflected that M.M. was PEACEFUL's manager.

32.     In or around August 2017, after a significant period of no contact, the CW was contacted by SKEFFINGTON. SKEFFINGTON told the CW that the CW needed to execute some documents that were needed "for an audit." As noted above, the CW had never been employed by SKEFFINGTON, SFM, or any of the ENTITIES. Instead, as part of CW's connection to RTC and JTR, SKEFFINGTON had contacted the CW looking for referrals to sober homes and treatment centers that could provide urine from patients with insurance. SKEFFINGTON offered to pay kickbacks in exchange for patient urine samples. The CW referred a sober home that was tied to RTC and JTR that provided patient urine samples to SKEFFINGTON. The CW also referred another treatment center that was ordering urine testing to SKEFFINGTON. From at least as early as September 2015, SKEFFINGTON and his associates paid the CW over $12,000 for these referrals.

33.     On September 22, 2017, the CW met with SKEFFINGTON. During the controlled meeting, the CW was equipped with devices for consensual monitoring, which captured both audio and video. SKEFFINGTON gave the CW a series of documents to execute. SKEFFINGTON told the CW that it was illegal to pay "commissions," that is, a kickback calculated as a percentage of insurance reimbursements. Instead, "marketers" needed to be paid hourly in order to be "compliant." The documents that SKEFFINGTON gave CW made it appear that CW was an hourly wage employee of PEACEFUL and NDT – two entities that CW had never previously heard of. The documents were back-dated to make it appear that they had been executed prior to SKEFFINGTON making payments to the CW in 2016. SKEFFINGTON also told the CW that similar documentation had been created for over 100 other lab representatives like the CW, and that the process took six weeks. The documents that SKEFFINGTON gave to the CW included: (1) a document entitled "Independent Sales & Marketing Agreement" with a handwritten date

11

stating that the Agreement was made and entered into on the "1st day of May 2016" between the CW and Peaceful Encounters; (2) an Invoice dated June 1, 2016 assertedly from the CW to Peaceful Encounters; (3) a document entitled "Legal Compliance Policy, Code of Conduct and Attestation" dated May 1, 2016; (4) a document entitled "Non-Disclosure Agreement" stating that the agreement was "made effective as of 5/1/16" by and between Peaceful Encounters, LLC and the CW; and (5) an IRS Form W-9 entitled "Request for Taxpayer Identification Number and Certification." SKEFFINGTON advised the CW to execute the documents and return them to him.

34.     The "Independent Sales & Marketing Agreement further stated that the parties "executed this Agreement to be effective as of this 1st day of May 2016" and bears two handwritten signatures that read "Peaceful Encounters, LLC" and agreed that Peaceful Encounters would pay the CW as "MARKETER" a "flat fee monthly rate" of $100. The "Peaceful Encounters, LLC" signature appears to have been written by M.M.

35.     The invoice provided that SKEFFINGTON gave to CW is dated June 1, 2016, and was made to appear as if it had been submitted by the CW to PEACEFUL for seven hours of "Marketing" services in 2016. It falsely documents that the CW completed seven hours of work at a rate of $100 per hour.

36.     The "Legal Compliance Policy" bears M.M.'s typewritten name, a handwritten signature that reads "Peaceful Encounters, LLC" that appears to be in M.M.'s handwriting, and the handwritten date of "5/1/16." The policy states that Peaceful Encounters expects its employees to "[n]ot pay or promise to pay, directly or indirectly, any money to a heatlcare provider, healthcare entity or healthcare facility, in exchange for their referring a patient, item, or service to the Company or to any of the Company's clients" and "[n]ot pay or promise to pay, directly or

indirectly, any money to a referral source in exchange for the referral source promising to induce the referral or for referring a patient, item or service from a healthcare provider . . ."

37.    The Non-Disclosure Agreement with PEACEFUL bears the handwritten date of "5/1/16" and bears the handwritten signature of M.M. as President on behalf of Peaceful Enounters, LLC.

38.    The W-9 was blank, except for a note indicating that, next to the signature line in the "Certification" section of the document, the CW was to write "5/1/16." In practice, an employer is required to have an employee complete a W-9 at the start of his/her employment to certify the employee's Social Security Number. This is done so an employer can prepare wages or earnings for an employee or contractor and properly report them to the Internal Revenue Service for tax purposes.

39.    In October 2017, SKEFFINGTON again met with the CW, so the CW could return the executed documents. The documents falsely stated that CW had been employed as an hourly employee of PEACEFUL. The CW was again equipped with devices for consensual monitoring, which captured both audio and video. Agents conducted surveillance on the meeting between SKEFFINGTON and the CW. SKEFFINGTON accepted the documents, including the W-9 tax document. SKEFFINGTON told the CW that "this [documentation] covers us and shows that you never received commissions." Despite this statement, SKEFFINGTON later made two offers to the CW to bring patient urine to a new laboratory that SKEFFINGTON was working with. Both of the offers made by SKEFFINGTON during the controlled meeting involved SKEFFINGTON paying the CW a percentage of insurance reimbursements for urine samples. Agents witnessed SKEFFINGTON accept the false and fraudulent tax documents, exit the meeting location carrying the documents, and enter the premises of SFM holding the documents.

40.     On November 8, 2017, federal agents executed a federal search warrant at the premises of SFM.  During the execution of the search warrant, agents located numerous signed and blank "marketing agreements" and tax documents.

### Federal Supervised Release of John Skeffington

41.     During the investigation of SKEFFINGTON, agents learned that he is currently on federal supervised release related to a conviction for two counts of mail fraud, 18 U.S.C. § 1341, from case number 12-CR-80217-KLR.  As a condition of the judgment imposed, SKEFFINGTON remains on supervised release until March 2018.

42.     The criminal conduct detailed above, which SKEFFINGTON has participated in also constitutes a violation of his supervised release.

### Conclusion

43.     Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from in or around September 2015 continuing through the date of this affidavit, in Palm Beach County, in the Southern District of Florida, JOHN MICHAEL SKEFFINGTON conspired with persons known and unknown to commit health care fraud, obstructed and attempted to obstruct justice, and obstructed and attempted to obstruct the criminal investigation of a health care offense; in violation of 18 U.S.C. §§ 1349, 1512(c)(2), and 1518(a).

FURTHER AFFIANT SAYETH NAUGHT.

WILLIAM STEWART
William Stewart
Federal Bureau of Investigation

Subscribed and sworn to before me
this ___6___ day of December, 2017.

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

14